IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                 Cr. No. 04-1566 JP

MANUEL MEDINA,

     Defendant.

MEMORANDUM OPINION AND ORDER

On September 28, 2004, Defendant filed Defendant's Motion to Exclude Inadmissible Evidence on Evidentiary and Constitutional Grounds (Doc. No. 23).  On January 31, 2005, the Honorable District Judge Warren Eginton, a visiting judge, began a hearing on the Defendant's motion.  At the conclusion of that hearing, Judge Eginton requested that the Plaintiff United States of America (USA) submit a brief regarding whether there is a federal physician-patient privilege, and if there is a federal physician-patient privilege, whether one can waive that privilege. The USA filed its brief on February 8, 2005 (Doc. No. 58) concluding that there is no federal physician-patient privilege.  On February 25, 2005, this Court continued the hearing on Defendant's motion and allowed the Defendant to submit additional briefing, which he did on March 9, 2005 (Doc. No. 67).  The USA responded to this additional briefing on March 22, 2005 (Doc. No. 70).

Assistant United States Attorney Stanley Whitaker was present at the hearings held on January 31, 2005 and February 25, 2005.  Assistant Federal Public Defender Roger Finzel and his client, Defendant Manuel Medina, were also present at the two hearings.  Having considered the briefs, relevant law, testimony, and oral argument, the Court finds that the Defendant's motion

should be denied.

A.  Background

  The USA alleges that on May 19, 2004, the Defendant maliciously attempted to damage and destroy, by means of fire and an explosive, the federal building at 500 Gold Ave. SW, Albuquerque, New Mexico, in contravention of 18 U.S.C. §844(f)(1).  The Defendant went to the Veterans Office (VA) office at 500 Gold Ave. SW on May 19, 2004 to pursue a claim for health care coverage but the Defendant was unsuccessful. The Defendant then left the VA office and went to the VA hospital that afternoon to seek help for depression with suicidal thoughts.

  At the VA hospital, Defendant was triaged and assigned a one-on-one sitter.  VA hospital staff subsequently arranged for the Defendant to see Dr. Michael Saiz, an attending physician in the emergency department who is trained in internal medicine.  When Dr. Saiz saw the Defendant, he was in pajamas and his clothes and possessions had been inventoried.  Dr. Saiz identified himself to the Defendant as an attending physician in the emergency department and planned to obtain pertinent information from the Defendant which could be later conveyed to a psychiatrist. Dr. Saiz noted that the Defendant's demeanor was calm and even a little flat as he began to interview the Defendant.[1]  To Dr. Saiz, this type of demeanor meant that the Defendant was serious.

  Dr. Saiz began the interview by asking the Defendant what he, Dr. Saiz, could do for the Defendant.  The Defendant volunteered to Dr. Saiz that he had been planning to cause an explosion at the VA office at 500 Gold Ave. SW by dropping calcium carbide pellets into a toilet

---

[1]Dr. Saiz, however, also noted that the Defendant was agitated about the VA denying his claim for health care coverage.

and igniting the resulting gases.  The Defendant told Dr. Saiz that the pellets were in a briefcase in his car.  Upon hearing this information, Dr. Saiz become concerned for the public's safety.[2]  Dr. Saiz then asked Defendant if he would agree to tell the police about this plan.  Defendant stated that he would speak with the police.[3]  At that point, Dr. Saiz notified the VA police.

After a short while, VA criminal investigator (CI) J. T. Arthur and VA Sgt. Brown arrived outside the Defendant's examination room at the VA hospital.  CI Arthur was dressed in civilian clothes and had his badge and gun. Sgt. Brown was dressed in his uniform.  Dr. Saiz related to CI Arthur what the Defendant had told him about the calcium carbide pellets and his concerns about what the Defendant might do if the Defendant left the VA hospital.  CI Arthur and Dr. Saiz then went into the Defendant's examination room while Sgt. Brown stayed by the door of the examination room.  Dr. Saiz introduced CI Arthur to the Defendant and asked the Defendant to repeat what he had said during the interview.  The Defendant told CI Arthur in a calm and coherent manner about his plan to cause an explosion at the VA office located at 500 Gold Ave. SW.  CI Arthur then asked the Defendant in a normal tone of voice if he could search the Defendant's car.  The Defendant agreed to a search and described to CI Arthur what the car looked like and where the car was parked in the VA hospital parking lot.[4]

At some point after the Defendant began speaking with CI Arthur, VA Officer Larson arrived at the hospital examination room.  CI Arthur sent Officer Larson to the VA police office

---

[2]Dr. Saiz was not concerned for the Defendant's safety because he was in pajamas in a hospital examination room with somebody watching him.

[3]Defendant subsequently refused to speak with Dr. Tandberg, another attending physician in the emergency department, and later refused to speak with a psychiatrist.

[4]The VA hospital parking lot was probably very full by mid-afternoon of that day.

to get a VA form for consent to search the car and a waiver of rights form.  After Officer Larson returned to the Defendant's examination room with the forms, Defendant completed the VA consent to search form which contains language allowing the signor to accompany the officer during the search.[5]  The Defendant also signed the waiver of rights form.  CI Arthur spent a total of five to ten minutes speaking with the Defendant.  Dr. Saiz was present for only a few minutes while CI Arthur spoke with the Defendant.

CI Arthur subsequently communicated with VA Officer Zimmerman to locate the Defendant's car in the VA hospital parking lot.  After locating the car, Officer Zimmerman informed CI Arthur that there was a briefcase on the front seat of the car.  Dr. Saiz then cautioned CI Arthur that the car might be booby-trapped because Dr. Saiz believed that the Defendant was trying to impress him with what was in the car.[6]  CI Arthur thought the car might be booby-trapped as well because the Defendant make the following requests:  1) that CI Arthur open the briefcase, 2) that the Defendant open the briefcase himself at the car, or 3) that the Defendant open the briefcase himself inside the VA hospital.

At some point after Officer Larson returned to the Defendant's examination room with the consent to search form and the waiver of rights form, Officer Larson was instructed to remain in the emergency department to ensure that the Defendant did not leave the examination room without first completing any necessary medical treatment before being taken into custody.  A

---

[5]Officer Larson read the consent to search form to the Defendant and had the Defendant read the consent to search form as well.  CI Arthur and the other officers witnessed the Defendant sign the consent to search form.

[6]CI Arthur did not know the Defendant was suicidal until Dr. Saiz later expressed his thoughts about the possibility of a booby-trap.

4

subsequent search of the briefcase in Defendant's car revealed calcium carbide pellets or crystals.

B.  Discussion

The Defendant moves to exclude any statements he made to Dr. Saiz, to suppress statements made to CI Arthur, and to suppress the evidence found as a result of the search of Defendant's car.

1.  Defendant's Statements to Dr. Saiz

The Defendant claims that his statements to Dr. Saiz are inadmissible in order to protect the psychotherapist-patient privilege.  Fed. R. Evid. 501 states in pertinent part:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

Under Rule 501, a criminal defendant can invoke a psychotherapist-patient privilege for statements obtained in the course of diagnosis or treatment when the privileged information is the sole basis for the government's prosecution.  *United States v. Glass*, 133 F.3d 1356 (10th Cir. 1998).  However, there is an exception to the privilege "'if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist.'"  *Id*. at 1357 (quoting *Jaffee v. Redmond*, 518 U.S. 1, n.19 (1996)).  Moreover, there is some authority for the proposition that disclosure to a third party of information subject to the psychotherapist-patient privilege waives that privilege.  *See United States v. Bishop*, 1998 WL 385898 *4 (6th Cir.).

The USA argues that the psychotherapist-patient privilege does not apply because Dr. Saiz is not a psychiatrist or psychotherapist and never represented himself to Defendant as one. The USA also argues that even if Dr. Saiz is considered a psychiatrist or psychotherapist, Dr. Saiz

was not treating the Defendant or diagnosing the Defendant, prerequisites to applying the psychotherapist-patient privilege. In addition, the USA argues that if the psychotherapist-patient privilege applies, then the serious threat of harm exception is applicable to this case.  Moreover, the USA argues that the Defendant waived the psychotherapist-patient privilege when he voluntarily spoke to CI Arthur about his plan to cause an explosion at the VA office at 500 Gold Ave. SW.  Finally, the USA argues that the Defendant cannot also claim a physician-patient privilege in a federal criminal proceeding under Rule 501.  *See, e.g., United States v. Bercier*, 848 F.2d 917, 920 (8th Cir. 1988); *United States v. Sutherland*, 143 F.Supp.2d 609, 611 (W.D. Va. 2001).

The Court finds that there was no psychotherapist-patient relationship between Defendant and Dr. Saiz, who is not a psychotherapist.  Even if a psychotherapist-patient privilege is assumed to have existed between the Defendant and Dr. Saiz, the serious threat of harm exception to that privilege applies in this case.  Moreover, Defendant's revelation to CI Arthur of his plan to use calcium carbide to cause an explosion at the VA office at 500 Gold Ave. SW constituted a waiver of any psychotherapist-patient privilege and provided a basis for prosecution other than the purported privileged information conveyed to Dr. Saiz.  Finally, as the USA argues, the Defendant cannot claim a physician-patient privilege in the context of this federal criminal proceeding.  Defendant's statements to Dr. Saiz, therefore, cannot be excluded or suppressed.

2.  Defendant's Statements to CI Arthur at the VA Hospital

The Defendant argues that his statements to CI Arthur at the VA hospital violated his due process rights under the Fifth Amendment because he did not give those statements voluntarily. In *United States v. Flores*, 313 F.Supp.2d 1188, 1200 (D. Utah 2004), the district court

summarized the law regarding voluntary confessions as follows:

> To be admissible, a statement or confession made by a defendant to law enforcement officers must be voluntary.  The government has the burden of establishing by a preponderance of the evidence that the statements were voluntary.  A defendant's confession is involuntary if the government's conduct causes the defendant's will to be overborne and "his capacity for self-determination critically impaired."

> A court will consider a number of factors in assessing the totality of the circumstances surrounding the questioning, including "both the characteristics of the accused and the details of the interrogation."  Relevant to this issue are, among other things, the age, education and intelligence of the accused, and the conduct of law enforcement officials, such as the length and location of the questioning and the use of punishment.

> However, while the mental condition of a confessant is relevant, it is not determinative.  The Supreme Court has explicitly provided that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'"  *Colorado v. Connelly*, 479 U.S. 157, 167 ... (1986).  Relying on *Connelly*, the Tenth Circuit has consistently declined to find a confession involuntary, regardless of the unique physical or mental characteristics of a particular defendant, absent police conduct amounting to coercion, improper inducement or the exploitation of a known mental condition or defect.

Citations omitted.  In this case, the Defendant voluntarily told Dr. Saiz that he would speak with law enforcement officials.  Although Defendant was dressed in pajamas and in a hospital examination room when he met with CI Arthur, Defendant nonetheless maintained a calm demeanor and was coherent.  Additionally, CI Arthur was dressed in plain clothes and used a normal tone of voice in addressing the Defendant.  A uniformed officer was present during CI Arthur's conversation with Defendant but the officer was not in the examination room; he stood by the door to the examination room.  Moreover, there was no evidence indicating whether the door to the examination room was closed or not while CI Arthur spoke with Defendant.  Dr. Saiz simply introduced CI Arthur to the Defendant and asked the Defendant to tell CI Arthur about what he had told Dr. Saiz.  Dr. Saiz, a nonthreatening person, remained in the examination room for a few minutes while CI Arthur spoke with the Defendant.  Furthermore, CI Arthur's

conversation with Defendant lasted only five to ten minutes.  The Court finds that the USA has shown by a preponderance of the evidence that the totality of these circumstances did not constitute the kind of environment which would produce an involuntary confession. Consequently, the Court concludes that the Defendant's statements to CI Arthur should not be suppressed.

> 3.  Warrantless Search of the Defendant's Car

The Defendant argues that the police officers' warrantless search of his car violated the Fourth Amendment because Defendant did not voluntarily consent to the search and there were no exigent circumstances to justify a warrantless search.

> a.  Consent

The USA bears the burden of showing that a defendant's consent to search was voluntary. *See United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996). To establish that a defendant's consent to search was voluntary, the USA must (1) "proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given" and (2) "prove that this consent was given without implied or express duress or coercion." *Id*. at 719 (quoting *United States v. McRae*, 81 F.3d 1528, 1537-36 (10th Cir. 1996)). "Consent to search may be voluntary even though the consenting party is being detained at the time consent is given." *United States v. Doyle*, 129 F.3d 1372, 1377 (10th Cir. 1997). Whether a consent to search is voluntary is a question of fact to be determined from the totality of the circumstances. *See United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir. 1993). Relevant factors include "the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is

compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public." *United States v. Hill*, 199 F.3d 1143, 1148-49 (10th Cir. 1999), *cert. denied*, 531 U.S. 830 (2000)(in context of consensual encounter).  Other factors relevant in deciding voluntary consent include the defendant's age, maturity and intelligence.  *United States v. Mendenhall*, 446 U.S. 544, 558 (1980).  No one factor is dispositive. *See Soto*, 988 F.2d at 1557.

Here, the Defendant verbally consented to a search of his car and signed a VA consent to search form.  Although Officer Larson read the consent to search form to the Defendant and had the Defendant read the consent to search form, the Defendant argues that the consent to search form is invalid because CI Arthur did not allow Defendant to go to the car during the search as provided by the form.  CI Arthur stated that the Defendant did not ask to merely accompany the police officers during the search of his car.  Instead, the Defendant asked to go to the car and to open the briefcase at the car.  CI Arthur reasonably believed that he could not grant that request because of safety concerns.  Since the Defendant wanted to do more than just accompany the police officers to his car, Defendant's argument regarding the invalidity of the consent to search form is without merit.

Independent if the consent to search form, the Defendant gave verbal consent to search the car.  The Defendant was calm and coherent when he gave this verbal consent.  There is no evidence that CI Arthur was threatening or abusive toward the Defendant.  Although the Defendant was in pajamas and in a hospital examination room, there is no evidence that the door to the hospital examination room was closed or that the Defendant felt intimidated by CI Arthur

who was dressed in plain clothes.  The Defendant did not present evidence that either Officer

Brown or Officer Larson was in the hospital examination room at any time or that their actions

somehow intimidated Defendant.  The Court finds that under the totality of these circumstances,

the USA has carried its burden of demonstrating that the Defendant voluntarily gave verbal

consent to search his car.

       b.  Exigent Circumstances

      The Defendant argues that since he was in a hospital examination room when the police

officers searched his car in the parking lot (as opposed to a roadway), there was no exigent

circumstance to excuse CI Arthur from obtaining a search warrant.  It is well-established that

under the automobile exception to the Fourth Amendment, a police officer can search a car

without a warrant if there is probable cause to believe the car contains contraband.  *United States

v. Ludwig*, 10 F.3d 1523, 1528 (10th Cir. 1993)(citing *United States v. Ross*, 456 U.S. 798, 809

(1982)).  "Although the automobile exception is based in part on exigency, 'the justification to

conduct such a warrantless search does not vanish once the car has been immobilized; nor does it

depend upon a reviewing court's assessment of the likelihood in each particular case that the car

would have been driven away, or that its contents would have been tampered with, during the

period required for the police to obtain a warrant.'"  *Id*. (quoting *Michigan v. Thomas*, 458 U.S.

259, 261 (1982)).  "If the police have probable cause to search a car, they need not get a search

warrant first even if they have time and opportunity."  *Id*. (citing *United States v. Crabb*, 952 F.2d

1245, 146 (10th Cir. 1991), *cert. denied*, 504 U.S. 925 (1992)).

      In *United States v. Ludwig*, 10 F.3d 1523, 1528 (10th Cir. 1993), the defendant's car was

parked in a motel parking lot when the police officer conducted a warrantless search of the car

prior to arresting the defendant.  Because the police officer had probable cause to search the car, "[t]he warrantless search of Ludwig's car therefore [was] not unreasonable even if there was little or no risk that Ludwig or a confederate would come out of the motel and drive away."  *Id*. Applying the principles in *Ludgwig* to this case, the Court finds that CI Arthur had probable cause to search the Defendant's car and that a search warrant was, therefore, unnecessary.

    4.   Failure to Advise Defendant of *Miranda* Rights

    Lastly, the Defendant argues that CI Arthur violated the Fifth Amendment's self-incrimination clause when he failed to advise the Defendant of his *Miranda* rights prior to obtaining Defendant's statements about his plan to cause an explosion by using calcium carbide. If a person is "subject to 'custodial interrogation,' even though his statements were voluntary, they cannot be used against him unless the government also shows [by a preponderance of the evidence] that the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights." *Flores*, 313 F.Supp.2d at 1203 (citations omitted).  "The Supreme Court has instructed that a person has been taken into police custody wherever he has been deprived of his freedom of action in any significant way.  The only relevant inquiry is how a reasonable man in the suspect's position would have understood the situation."  *Id*. at 1202-03 (citations and internal quotation marks omitted).

    When Dr. Saiz asked the Defendant to tell CI Arthur about the plan to use calcium carbide to cause an explosion at 500 Gold Ave. SW, the Defendant was in a hospital examination room in pajamas and his clothes had been inventoried.  Defendant had not been handcuffed at that time nor was there evidence that anyone told Defendant that he could not retrieve his clothing and leave the VA hospital.  It is unclear whether Officer Larson had been posted in the emergency

department to prevent the Defendant from leaving the examination room prior to the execution of the waiver of rights form.  However, there is no evidence that the Defendant knew that Officer Larson was instructed to prevent him from leaving the examination room.  The Court finds that a reasonable person in the Defendant's position would have understood that he was not in custody prior to the execution of the waiver of rights form.

IT IS ORDERED that Defendant's Motion to Exclude Inadmissible Evidence on Evidentiary and Constitutional Grounds (Doc. No. 23) is denied.


_____
SENIOR UNITED STATES DISTRICT JUDGE